Morning. This is the Court. Stephen Frampton for the appellate Charles Tatom. What we have here is four basic issues. One, the prejudicial effect of admitting all this uncharged evidence, whether or not it substantially outweighed the probative value. Two, whether Mr. Tatom was denied his right to a jury trial. Three, was Mr. Tatom not convicted by a unanimous jury. And four, was there ineffective assistance of counsel at the trial. I don't want to just go through and just read the brief, basically. But regarding the prejudicial effect of this extra evidence, it was offered in the government's case-in-chief. They were not rebutting any some sort of a denial of knowledge or intent or plan or motive or all the exceptions of bringing in 404B evidence. It was all offered in the case-in-chief by their own witness. I guess I'm more concerned about whether the curative instructions were adequate. Well, I guess I would think not. There were four firearms charged, approximately, or exactly 14 firearms, plus bow and arrows and scopes and photographs. And it was just overkill. I think you can't unring the bell, so to speak. But the judge said, no, you can't consider it. You're just looking at the one thing he's charged with here. You mustn't consider that. I know that the court did that, maybe if it was maybe a minor transgression against the concept. But this one, it was just so over the top. I mean, the jury's just, you know, drowning in firearms and weapons. And it was really unnecessary. If you take Judge Fletcher's comment about the curative instruction, the one that was actually jury instruction, I think it was number 15 that was given, and then you look at the jury verdict, they managed to single out the Marlin 60 .22 long rifle caliber semi-automatic. That's correct. And that was in the bedroom. I'm sorry? That was in the bedroom, correct? Yes. So what was the evidence about that gun? What did it show about that particular gun? Well, the evidence was about that gun was how this all started was this Mr. Mugis was this intoxicated acquaintance that came over to Mr. Tatum's house, the appellate's house, had all these firearms. They were all his. And I believe that firearm was described as his son's .22, Mr. Mugis's son had a .22. And I guess it's a little unclear how the .22 got there, but it was undisputed that Mr. Mugis brought all these guns over. He didn't bring over the .22. Well, it's hard to know because when he came over, he was so intoxicated, he just kind of grabbed all these guns and brought them over. And if one of them was his son's .22, I think it's reasonable to assume that maybe that got thrown in the pile with everything else. And I think that's Mr. Tatum, I think, testified to something to that. I mean, his weapon was found in Mr. Tatum's bedroom. Right. But Mr. Tatum wasn't there. Mr. Tatum's not denying that these guns were there. What he's saying is this guy brought all these guns, so he got out of there and went and stayed with the neighbors up the road. And he wasn't even there when this Mr. Mugis was there. And when all the police were executing the search warrant, there was all this chatter on the radio about there's cops swarming your house or swarming his house. So then they jump in the car with the neighbors and drive down. And Mr. Tatum was met by the police down this driveway, which is quite a distance from the house. So Mr. Tatum wasn't even there when the police arrived. And it was his testimony that he was staying up the road. So then he meets them at the bottom of the hill. They essentially walk him up the hill, set him down on the couch in the living room, and then start doing the search. And then Mr. Tatum's just sitting there, and he sees these guns, and he's kind of pointing them out like, there's something over there, and there's something. So they're going around the house, grabbing all the guns. And it's Mr. Tatum's position. It wasn't he didn't know they were there. It was just I got out of there when they were there. It was kind of like if somebody starts doing drugs, you don't want to be frequenting around that. You just get out. I thought it was kind of interesting, though, that despite all the statements about all these guns, like you say, it was like overkill to let all this stuff come in. And I don't know. If the judge said something about context, I don't know what that was all about. But nonetheless, the jury seemed to focus on this one weapon that they found in his bedroom. I don't know. It seemed to be part of what Mucus, his buddy, had brought over. I mean, it's hard to get in a jury's mind and know exactly what they're thinking. But, I mean, you get so many guns, there's bound to be one. They found him not guilty on several of the other, several of the other charged weapons. It seemed that they were able in their minds to segregate out for whatever reasons and weren't thinking about all this other stuff that had come in from his priors. Well, I mean, it's hard to know for sure. I mean, you get enough of them in there, throw enough mud, something's going to stick. Well, there is another little bit of a problem in that the objections made about when these guns come in or the charts or the exhibits were not exactly 403 objections. We kind of have to widen our scope to get to 403. And if they're not 403 objections, well, then it's plain error by standard of review. I think the defense lawyer did articulate somewhat that there's just all these guns coming in and something to that effect. There's just guns coming out of it. It's not a general objection. We've got to have an objection made at the time of the admission of the evidence. I think he did object on the record. Well, he did on some, but there were other objections reading the record. I wasn't even sure it was a 403 objection. It was a little child and I can construe maybe to get to that, but then it's an abuse of discretion. But my worry is plain error is everything else, like the ammunition chart or the exhibit, the photographic exhibits or that it's cumulative, all that's plain error stuff, which is a tougher standard. Which kind of ties into the last issue, the ineffective assistance issue. Don't you think that's better left to habeas? Well, I think normally it is, but in this case, the record's so rich in things. I mean, it's just continuous something. I mean, just unbelievable. Like hearsay. The witness would be talking about what some other witness said. Mr. Tatum knew the guns were there. Mr. Tatum shoots guns. And it's just like somebody get on their feet and object because that's hearsay and it goes directly to the issue of did he knowingly possess firearms. And it was like the police were doing it and the witnesses, the disgruntled wife of Mr. Mugis was doing it. And, I mean, it was just – and it was without exception. I mean, there was no – if it was like an admission by the defendant, it would be what some other witness is saying the defendant said he said or something. I mean, it was like double, triple hearsay going on. But I don't know. Based on this record, he did call seven different defense witnesses. He did make numerous objections, some good, some not so good. He did participate actively. It seems to me that Judge Fletcher's question is pretty good because it would certainly be better developed if he's going to win this if he did it a different way than to do it in a direct appeal. Because, I mean, based on my standard that I have to view here, a little difficult. It would be better if he had a better chance to develop his record. Well, you know, it's always better, definitely. It's always better. But, you know, Mr. Tatum is going to be done with his sentence in about six months. So I guess that's an option. If you want to address any other issues, please go ahead. Unless the Court has some questions about that. No. Thank you. Okay. Save your time for rebuttal. Thank you. You guys have time for rebuttal. Good morning, Your Honor. My name is Earl Hicks, and I was the assistant U.S. attorney that tried this case. And I want to discuss a number of these facts with the Court. First of all, again, we have a brief that we've submitted to the Court. And the concern that the government has is that the Court has characterized this as overkill. Well, I'd be interested in hearing your strategy and why this was all necessary. Yes. Why this was all necessary is … There's a ton of stuff. Yes, Your Honor. Why this was all necessary was because the defense was that the defendant lacked knowledge and that all of the guns that were in the house were brought there by carrying mugis. And this was a defense, again, where we had prior statements to law enforcement that people had made, and then all of a sudden everybody in the case, all of the witnesses that the government had been involved in, were all of a sudden changing their testimony, and it was made known to the government. And the issue there became the relevance of where are these guns located at, the defendants in this house. Because to begin with, first of all, there's the issue of a dispute in testimony as to when the guns actually went into the house. Because the record, what indicates is that you had two law enforcement officers down that night, the night that the defendant, Mr. Tatum, was in his home, was down at a vehicle that Mr. Mugis brought the firearms in, and they weren't there. They weren't there. The officers testified they did not see them in the back of the car. Where were they? Were they in the house? Didn't Mr. Tatum know they were in the house? All right? So the number of firearms, if you have one firearm that's hidden underneath the seat of a couch that somebody brings in, that's totally different than a circumstance where you have all of these long rifles, and now you have this claim that I didn't know they were in there. You didn't charge them with all these other guns. I didn't charge them with all these other guns, and there are reasons why you charge and why you don't charge. But because we don't charge doesn't mean we can't bring in evidence that's inextricably intertwined and that don't show the context. So were we just supposed to say, hey, there were four guns in the house and there was ammunition in the house, and then everything else was supposed to be ignored, and then the defendant's witnesses come in and say he didn't know that any of those firearms were in there? That's not fair. There's probative value there to the issue of where the firearms are, the quantity of the firearms are, and the knowledge of the defendant. And when you're dealing with knowledge of the defendant, the government suggests that the number of firearms, the size of the firearms, because, again, this is not a little – these aren't little guns. These are long rifles, and they're hunting rifles. We're not bringing in assault weapons and things like that. So the question is, is it overly prejudicial? Now, you asked a question about the facts as to the 22 that was in the bedroom. And the facts as to the 22 in the bedroom were that initially Mr. Tatum, who contrary to what counsel has said in his brief, was read his constitutional rights. Mr. Tatum says at the bottom of the hill when the police first arrived, the FBI and Special Agent and Captain George says, no, we read him his constitutional rights when we were in the car when we were asking him questions. Mr. Tatum said he was read his constitutional rights. And what happens is during the time that they're in the vehicle, other law enforcement officers are inside the house and they're conducting a search. And they find a rifle, a particular Marlin rifle, which is the one he's convicted of. And they find that in the bedroom on top of a dresser, and it's fully loaded. And then what they also find is they find a jar of ammunition in that bedroom, and then in the living room they find a jar of ammunition in the living room. Now, what happens is Mr. Tatum is asked, what about the 22 in your bedroom? Words to the effect. I'm not trying to quote this. And he tells them that that 22 was brought to his house by his girlfriend, Linda Dalrymple's grandson. They called him Porkchop. And it had been there since the last hunting season. All right? Remember, the testimony of Mugis is I brought everything. Mr. Tatum is then asked about the .30 rifle. And he says the same thing. Mr. Barsay, known as Knock-Knock, brought it to the house, and it had been there since the last hunting season. And the agent testified that he said, words to the effect, it was in the house. And we get into this up there, down there. When I say up there, I mean up here and that. But that's what he said. In addition to that, when the police first came into contact, there was a person by the name of Madonna Plerd. Madonna Plerd was out front. The officers, and the initial story was that I just brought him back because I had just taken him to get his welfare check. That was the initial story that she gave. But what she does is she says to the police, she tells the police, according to two witnesses in the trial, two law enforcement officers, before they go into the house, that he's got a .22 caliber rifle that he uses to shoot skunks. She comes to trial. She brings in a broken up starter pistol and claims that this is what she meant. And it wasn't even functional unless you held it together and possibly blew your hand off. So we had all of these changes in testimony. Now, very interestingly, when we have two other firearms, I think clear of the ammunition and the rifle there. Now, one of the things that also happened is Mugis was asked to describe the .22 rifle. Mugis described the .22 rifle that took a clip. This one did not take a clip, and that was significant also. But then in addition to that, Mr. Mugis denied bringing that .22 ammunition in the house on his direct examination. I know that's not in this part of the record, but when you're asking about the facts that are there. The thing about the .22 rifle is that it seems that the story about that rifle seems to be different, and the jury is able to focus on that. That's the weapon that the jury wishes to turn their verdict guilty, and the .22 ammunition. It seems that, as Judge Fletcher said, they seem to be able to decipher through all this stuff. My only concern about the overkill was, I mean, it just wasn't photographs that you had in it. Or have the witnesses testify, Mr. Mugis or whatever, testify about what weapons he brought. If I'm not mistaken, you actually presented firearms. Firearms. Yes. I mean, it just wasn't. I mean, there's a way. In my years of experience, I will tell the court that photographs can be very deceptive, and the government, when you asked me my strategy, was to show the size of these firearms, that it wasn't something that could be easily hidden. And where were they located? Some of those large rifles were located in the room that the defendant called the south room. We'll call it that because that's where he would go. That was his particular room. And so what the circumstances. Another very interesting thing, the three firearms underneath, to talk about how the jury distinguished this. When he points it out to law enforcement, what do you think? When he comes in the house, the first thing he does is says there's firearms there. Okay, there's two reasonable presumptions that you can have there. The first reasonable presumption is that he knew they were there to begin with, and it's contrary to his story. The second reasonable presumption is he just saw them and he knew the police were there, and he wanted to notify the police that there were these firearms there. Now, the jury obviously made a distinction and said the government hasn't proven beyond a reasonable doubt that first inference, that he knew that they were there. Now, there's no question that Mr. Mugis brought some of those firearms in there. And I suggest I could have charged every single one of them, and it shouldn't turn on that. It should turn on whether they were relevant and was it an abuse of discretion by the court. And then some of the cases that we've cited where they brought in the fact that the defendant was using drugs. The butcher case where there were guns out and they used those, those are far more, far more egregious. And I only suggest overkill is a funny word for a prosecutor because there's this line as to what's proof beyond a reasonable doubt.  The other issue, let me talk to you about the quickest issue that I can talk to you about is Judge Flesher, your suggestion that this should go back before the district court on habeas is absolutely appropriate. I was very concerned that none of these things were developed. And sometimes I suggest that counsel hasn't put them in context for you. Some of the things were not put in context in the brief. Sometimes I'm allowed to ask leading questions because I have witnesses who have backdoored me, and now I'm asking them those questions. And then I can ask them, did you tell somebody something? And if he denies it, then I can ask another witness to say, did he tell you that? And it's not for the truth of the matter asserted. It's for is he making inconsistent statements. And you can look at that when you determine a witness's credibility. And that happened there. Some of the leading questions are just preliminary. I don't think you need to belabor this point with me. Okay. And the next thing, I'm sorry, Your Honor. And the next thing is you have the issue that he was incompetent because he didn't raise the issue, didn't move to suppress because the defendant wasn't Mirandized. Well, let the court down there decide that because clearly there were Miranda warnings given. The defendant admits to it. The next one is the search. Okay. All of those should be developed because the court doesn't have the facts around the search. So that should be there. The unanimous jury verdict. Years ago I had this experience. And I was a defense attorney many years ago. And the experience that I had is that all 12 jurors came out and the judge said, is this your verdict and the verdict of the jury? And this was in state court. And everybody raised their hand that this was their verdict and the verdict of a jury. Then they sat down for the judge to thank them. And then a gentleman stood up and said, well, the only reason it's my verdict is because they said we'd be here forever if you didn't vote this way. There's no indication of any coercion or anything whatsoever here. It's very interesting that on Friday night the jury wanted to say, hey, look, we don't want to deliberate anymore basically. Do we have to? We've already found one of these things. And do we have to come back? Now, the unfortunate thing is the judge did speak specifically to the juror initially. And that's in the record. It's not in the excerpt of record by the defendant. But it is in the record that first page is left out. And the juror said basically I hurt myself, you know, maybe a broken ankle and I'm going in. Those are very unusual circumstances. I don't know how much investigation is necessary to do. I know that the court, just based upon common sense and human experience, is thinking maybe she's got to take pain medication. Who knows what's going to happen, okay? I think that it was reasonable under the circumstance. And I think that the court has to consider whether that's an abuse of discretion. Clearly there was unanimous jury verdict. There may have been confusion. That's not unusual. This is not the first time it's been seen. But the jurors came back. They came back with the exact same verdict. There was no instruction to the jury other than go back and continue your deliberation. There was nothing to pressure. So with that in mind, the government's position is that the conviction should be affirmed and that the matters on encompass of counsel should be sent back or be brought up on a 2255. Thank you. Thank you. Anything further from the counsel in rebuttal? Steven Crampton for Mr. Tatum. In this case, it wasn't that the defendant lacked knowledge. It's not the 404B exception situation. He knew they were there and he left. But that was what his testimony was. And all these firearms were offered in the case in chief. They weren't offered as rebuttal to some sort of mistake or one of those 404B exceptions. It was just avalanche, just kapow. And without any justification, there was really no need to do that other than you win easier. It makes it pretty easy to win, I guess. You know? I guess that's the reason. And he didn't say in his testimony that he brought these weapons to the house. There was this thing going back and forth about what it meant when you're up here. Because this happened up in the rural northern part of Stevens County. People live out in the country. And I think this kid lived with his mom or something in Spokane. But sometimes he'd come up, stay with his dad. And there's up here and down there. There's this kind of business. The government's taking all this stuff out of context and going, aha, okay, we got him. He just admitted to the crime. And just hammer this guy. I mean, they don't like him. They don't. And you saw in the sentencing they bring in all this stuff about, oh, he's part of outlaw biker gangs and all this stuff. It just doesn't really have any bearing on, and no proof or anything that was spent. He didn't challenge his sentencing. He didn't challenge it. No. But, I mean, it just kind of shows what the mentality is on this thing. All right. Is that it? That's it, Your Honor. Thank you. Thank you. Appreciate it. The matter will be submitted. And we appreciate your arguments.
judges: Fletcher, Paez, Smith